UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                              :
IN THE MATTER OF D.T.J., *a minor child under the age*        :
*of 16,*                                                      :
                                                              :                13 Civ. 4087 (PAE)
                                                              :
GYULA JANOS JAKUBIK,                                          :                OPINION & ORDER
                                                              :
                                          Petitioner,         :
                                                              :
                        -v-                                   :
                                                              :
EVA SCHMIRER,                                                 :
                                                              :
                                          Respondent.         :
                                                              :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Petitioner Gyula Janos Jakubik ("Jakubik" or "Petitioner") petitions this Court for the

return of his daughter, D.T.J., to Hungary, pursuant to the Hague Convention on the Civil

Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89

(the "Convention" or "Hague Convention") and its implementing legislation, the International

Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.* ("ICARA").  D.T.J., who is

approximately two weeks shy of turning age 15, was removed from Hungary and brought to the

United States by her mother, Respondent Eva Schmirer ("Schmirer" or "Respondent"), on

September 6, 2011.  For the reasons that follow, Jakubik's petition is denied.

I.      **Procedural History**

        On June 14, 2013, Jakubik filed the petition, *see* Dkt. 1, along with an application for

emergency relief in the form of an Order to Show Cause, *see* Dkt. 2.  That Order, which the

Court issued that day, directed the United States Marshals Service to take D.T.J.'s and

Schmirer's passposts into custody for safekeeping by the Court; it set a hearing for June 24, 2013.

On June 24, 2013, the Court held a conference with counsel for Petitioner and for Respondent.  At that conference, the Court discussed with the parties the potential for a voluntary resolution of the case, and directed the parties to meet and confer regarding such a resolution.  *See* Dkt. 4.  The Court also raised with the parties whether an attorney should be appointed for D.T.J.  *See id.*

On June 26, 2013, the Court received a letter from counsel for Petitioner, reporting on the parties' Court-ordered meet-and-confer session, which did not lead to a voluntary resolution. Dkt. 7.  That letter also informed the Court of the parties' agreement that the Court should appoint separate counsel for D.T.J. "as soon as practicable."  *Id.*

On June 27, 2013, the Court held its next conference with the parties.  At that conference, the Court set a pretrial and trial schedule.  Also on June 27, 2013, Respondent filed her answer to the petition.  *See* Dkt. 5, 10.

On July 3, 2013, the Court appointed Jennifer Baum, Esq., as counsel for D.T.J.  *See* Dkt. 9.  On July 9, 2013, the Court granted, over Petitioner's objection, *see* Dkt. 12, D.T.J.'s motion to intervene as a party to the case.  *See* Dkt. 13 (available at No. 13 Civ. 4087 (PAE), 2013 WL 3465857 (S.D.N.Y. July 9, 2013)).

Between July 22 and July 25, 2013, the Court conducted a bench trial.  At that trial, the Court heard testimony from the following witnesses:  Jakubik; Jakubik's "life partner," Adrienn Viczian, with whom he cohabits and has a child; Schmirer; Leslie Schwartz and Damaris Veras, two of D.T.J.'s teachers at North Rockland High School; Katalin O'Toole, D.T.J.'s grandmother (and Schmirer's mother); Dr. Mark Rand, a child psychologist; Professor Lenni Benson, a

professor of immigration law; and D.T.J., whom the Court interviewed at length, with D.T.J. under oath, in the Court's robing room, having been provided with proposed questions from the parties, *ex parte*, in advance.  The Court's interview with D.T.J. was conducted in the presence of counsel; and counsel were given the opportunity before the interview ended to propose supplemental questions to the Court. The Court has set out on the record the reasons for receiving D.T.J.'s testimony in this manner.  *See* Transcript of July 12, 2013 Conference 29–35; Transcript of July 17, 2013 Conference ("July 17 Tr.") 3–8.

## II.    Applicable Law

The purpose of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  Hague Convention, pmbl.; *accord Souratgar v. Fair*, No. 12–5088, 2013 WL 2631375, at *2 (2d Cir. June 13, 2013) (quoting *Abbott v. Abbott*, 130 S. Ct. 1983, 2002 n.6 (2010)).  The Convention does so by "ensur[ing] that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States," *Chafin v. Chafin*, 133 S. Ct. 1017, 1021 (2013) (quoting Hague Convention, art. 1), so that parents are "deter[red] from crossing international boundaries in search of a more sympathetic court," *Blondin v. Dubois* (*Blondin II*), 189 F.3d 240, 246 (2d Cir. 1999) (citation omitted).  *See* Elisa Perez-Vera, *Hague Convention on the Civil Aspects of International Child Abduction: Explanatory Report*, ¶ 14, *in* 3 Acts and Documents of the Fourteenth Session (1982) ("Perez-Vera Report") (in the absence of such a system, "the abductor w[ould] hold the advantage, since it is he who has chosen the forum in which the case is to be decided, a forum which, in principle, he regards as more favourable to

his own claims").  ICARA was passed in 1988 to implement the Hague Convention in the United States.  *See id.*

The Convention allows a parent alleging breach of his or her custody rights to initiate a proceeding to repatriate the child to the state of "habitual residence."  ICARA provides that "[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for . . . securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."  42 U.S.C. § 11603(b).  Under the Convention, a removal is wrongful when "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention."  *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005); *see* Hague Convention, art. 3 ("The removal or the retention of a child is to be considered wrongful where . . . it is in breach of rights of custody attributed to a person . . . , either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."); *see also Abbott*, 130 S. Ct. at 1989 ("A removal is 'wrongful' where the child was removed in violation of 'rights of custody.'" (quoting Hague Convention, arts. 3, 5)).  ICARA places on the petitioning party the burden of proving by a preponderance of the evidence that a child's removal was wrongful.  42 U.S.C. § 11603(e)(1)(A).

A petitioner who has established wrongful removal by a preponderance of the evidence has made out a *prima facie* case under ICARA.  At that point, ICARA requires that the child be repatriated for custody proceedings unless the respondent can make out one of four "narrow" affirmative defenses.  42 U.S.C. §§ 11601(a)(4), 11603(e)(2); *Souratgar*, 2013 WL 2631375, at *2; *Blondin II*, 189 F.3d at 245.  The four affirmative defenses include that: (1) the proceeding was commenced more than a year after the child's removal and the child has become settled in his or her new environment, Hague Convention, art. 12; (2) the person seeking the child's return was not exercising his or her custody rights at the time of removal or retention, or he or she consented to—or subsequently acquiesced in—the child's removal or retention, Hague Convention, art. 13(a); (3) returning the child poses a "grave risk" to his or her physical or psychological well-being or would place him or her "in an intolerable situation," Hague Convention, art. 13(b); or (4) the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," Hague Convention, art. 20.  The first and second affirmative defenses must be established by a preponderance of the evidence, *see* 42 U.S.C. § 11603(e)(2)(B); the third and fourth must be established by clear and convincing evidence, *see* 42 U.S.C. § 11603(e)(2)(A).

In addition, courts may consider a fifth affirmative defense:  Article 13 provides that "[t]he judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention, art. 13; *see also Blondin v. Dubois* (*Blondin IV*), 238 F.3d 153, 166 (2d Cir. 2001) ("[T]he unnumbered provision of Article 13 provides a *separate* ground for repatriation and . . . a court may refuse repatriation *solely* on the basis of a considered objection to returning by a sufficiently mature

child." (emphases in original)); *Broca v. Giron*, No. 11 CV 5818 (SJ)(JMA), 2013 WL 867276, at *9–10 (E.D.N.Y. Mar. 7, 2013), *aff'd by summary order*, No. 13-1014-cv, 2013 WL 3745985 (2d Cir. July 18, 2013); *Matovski v. Matovski*, No. 06 Civ. 4259 (PKC), 2007 WL 2600862, at *9 (S.D.N.Y. Aug. 31, 2007); *accord de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007).  Like the Article 12 defenses, this defense must be proven by a preponderance of the evidence.  *See* 42 U.S.C. § 11603(e)(2)(B).

Importantly, "[a] decision under [the] Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."  Hague Convention, art. 19; *see Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) ("The Convention does not establish substantive standards for resolving the merits of any underlying custody dispute.  Rather, the Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings." (citations omitted)); *Blondin II*, 189 F.3d at 245 (same); 42 U.S.C. § 11601(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."); *cf.* Perez-Vera Report, ¶ 124 (decision regarding return of the child "must not prejudge the merits of custody rights"; Article 19 "seeks to prevent a later decision on these rights being influenced by a change of circumstances brought about by the unilateral action of one of the parties").  And the affirmative defenses "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody."  *Blondin II*, 189 F.3d at 246; *accord In Re Lozano*, 809 F. Supp. 2d 197, 218 (S.D.N.Y. 2011), *aff'd*, 697 F.3d 41 (2d Cir. 2012).

Finally, it should be noted that, even where an affirmative defense has been established, it remains within the discretion of a court whether to allow the child to remain with the abducting parent or to order repatriation. *See Souratgar*, 2013 WL 2631375, at *3 ("[E]ven where the grounds for one of these 'narrow' exceptions have been established, the district court is not necessarily bound to allow the child to remain with the abducting parent." (quoting *Blondin II*, 189 F.3d at 246 n.4)); *Lozano*, 809 F. Supp. 2d at 218; *Matovski*, 2007 WL 2600862, at *7, 15.

## III.   Findings of Fact

Based on the parties' submissions and the testimony at trial, the Court makes the following findings:

Jakubik and Schmirer met in 1996, at the ages of 20 and 19, respectively; they became cohabitants and life partners. Jakubik Decl. 1; Trial Transcript ("Tr.") 21, 259. On August 11, 1998, D.T.J. was born to them in Kistarcsa, Hungary. *See* Jakubik Decl. 1; Schmirer Decl. ¶ 2; Tr. 22, 259. For the next six years, D.T.J. and her parents lived together in Valko, Hungary. *See* Jakubik Decl. 1–2; Schmirer Decl. ¶ 14; Tr.  23, 260. Jakubik worked, and still works, in the construction business. Tr. 20–21.

During the time the couple was living together, Jakubik was physically and verbally abusive to Schmirer, both in and out of the presence of D.T.J. This opinion chronicles some of these episodes in greater detail below, *see infra* pp. 31–34, but the evidence clearly established that Jakubik engaged in a pattern of serious physical and verbal abuse of Schmirer during the time they were a couple, including hitting and punching her, as well as threatening to kill her on repeated occasions. *See* Tr. 263–84; Petitioner's Exhibit ("PX") 2 at 2. The Court found Schmirer's testimony credible and indeed compelling on this point. Jakubik, by contrast, admitted only to having hit Schmirer on one occasion, *see* Tr. 32, in contradiction to Schmirer's

more credible account.  Jakubik's denial of other acts of violence is also in tension with the Hungarian court's having found "several occasions" of physical assault of Schmirer by Jakubik, *see* PX 2 at 2, and with the repeated references to, and threats of, violence that permeate Jakubik's 2012–2013 Facebook communications with D.T.J.  *See, e.g.*, Intervenor's Exhibit ("IX") 6 at DTJ0131–DTJ0132, DTJ0140—DTJ0141; IX2 at DTJ0117.

The couple separated in 2004.  *See* Jakubik Decl. 2; Schmirer Decl. ¶¶ 11, 14; Tr. 23, 260; PX 2 at 2.  Schmirer left the residence, taking D.T.J. with her; the two moved to a residence in Karancsaija, where they lived with a Laszlo Paulo, with whom Schmirer was then in a relationship.  Tr. 260.  Jakubik alleges that he was unable to contact his daughter or Schmirer for the next six months.  Jakubik Decl. 2; Tr. 24.

On August 11, 2005, D.T.J.'s seventh birthday—while D.T.J. was living with Schmirer and Laszlo Paolo—Jakubik came to take D.T.J. to McDonald's to celebrate her birthday.  Tr. 281–82; 421.  Both Schmirer and D.T.J. vividly recall this incident, and the Court found their testimony about it credible.  Specifically, upon their return to Schmirer's home, where Schmirer was standing outside awaiting them, Jakubik refused to allow D.T.J. to exit the car, grabbing her by the arm and hand.  Tr. 283, 422.  Jakubik was shouting at Schmirer, who was attempting to pull D.T.J. from the car.  Tr. 283, 422–23.  Suddenly, Jakubik drove off.  Tr. 283, 423.  For the next 10 months, D.T.J. lived with Jakubik in the house in Valko with Jakubik's mother.  Tr. 25, 423–24, PX 2 at 2.  D.T.J. began the first grade there.  Tr. 25, 425; PX 2 at 2.  On one occasion, on August 20, 2005 (a national holiday in Hungary), D.T.J. recalls being told about her mother attempting to come, accompanied by relatives and men of imposing stature, to retrieve her.  Tr. 425–26.  D.T.J. believes that her father attempted to hit her mother with his car, but that the men intercepted to prevent that from happening.  *Id.*; D.T.J. Decl. ¶ 16.

Schmirer brought a proceeding in Hungarian court to have D.T.J. returned to her custody.  On June 22, 2006, the Municipal Court of Salgotarjan, Hungary granted custody to Schmirer.  PX 2.  The Court recognized that Jakubik had failed to return D.T.J. to her mother after a visitation, and had instead brought her to live with him.  *Id.* at 2.  Jakubik was given visitation rights on every other weekend from 10 a.m. Saturday to 5 p.m. Sunday, as well as half of any multi-day holidays.  *Id.*; *see* Jakubik Decl. 2; Schmirer Decl. ¶ 4; Tr. 29.  For the next five years, D.T.J. lived with Schmirer in Karancsaija.  Schmirer Decl. ¶ 14; Jakubik Decl. 2.

In 2007, Jakubik married Adrienn Viczian, and in 2008, the two gave birth to another daughter, Bogolarka.  Tr. 41–42, 180–81.  The degree to which Jakubik made child support payments to Schmirer during the period from 2006, when Schmirer was given custody of D.T.J. and Jakubik was granted visitation rights, and 2011, is disputed, and Schmirer has made inconsistent statements on this point.  *See* Schmirer Decl. ¶ 11; Tr. 346–48, 365.  The Court finds, however, that Jakubik made at least approximately 10 such payments.  *See* PX 4; Tr. 347–48, 365.  During that time, D.T.J. visited her father (for the majority of that time, in his residence with Viczian and their daughter) on some occasions, although the frequency of those visits was disputed, with Jakubik claiming that they were frequent and D.T.J. and Schmirer claiming that they were sporadic.  *Compare* Tr. 37, 43, *and* Jakubik Decl. 2, *with* Tr. 448, 495, *and* D.T.J. Decl. ¶ 10.  D.T.J. testified that she visited Jakubik approximately 30 times during her last two years in Hungary.  Tr. 448.  The Court credits that D.T.J. made at least that many visits to Jakubik during this period.

Upon her visits to Jakubik's household, D.T.J. and Jakubik would share a bed, with the other two members of the household in another room.  Tr. 63, 443.  D.T.J., who wore pajama pants and a t-shirt to bed, alleges that on one such occasion, she awoke to find her father, who

slept in a t-shirt and his underwear only, cupping her breast with one hand and touching her undergarments in the area of her crotch with the other.  Tr. 444.  Both hands were still.  Tr. 444–45.  D.T.J., however, could not say for certain that Jakubik was awake at that moment.  She testified that she thought he was, but could not explain the basis for this perception.  Tr. 444–45.  D.T.J. retreated to the other side of the bed; her father did not ever attempt to touch her intimately again.  Tr. 445.  D.T.J. never thereafter raised the incident with her father, or with anyone else until the onset of this litigation.  Tr. 344, 445–46.

After that time, D.T.J. continued to visit her father.  However, she testified, she did not spend the night at his house again.  Tr. 448–49.  When her father would inquire as to why, she says, she would not say.  Tr. 449.[1]

Around the spring of 2011, Schmirer and D.T.J. began talking seriously about coming to America.  Tr. 310.  Schmirer's mother had, by that time, been living in Haverstraw, New York for a few years with her current husband, John O'Toole, and the two understood that they would be able to live with Schmirer's mother if they came to the United States.  According to D.T.J., they made the final decision to come to the United States, together, about one month before their departure in September 2011.  Tr. 403.  Schmirer and D.T.J. both acknowledge that they did not inform Jakubik of their plans.  PX 1; Tr. 406.  At the time they left for the United States, D.T.J. testified, she and her mother expected to stay approximately three months; the decision to stay permanently came later.  Tr. 403.

---

[1] The Court was not persuaded, one way or the other, whether D.T.J. in fact literally never spent a night at her father's home after this incident.  It is possible that this account of such a clean break exaggerated matters, and that D.T.J. instead scaled back her overnight visits.  The Court's resolution of this case is unaffected by its inability to resolve this ambiguity.

The last occasion on which D.T.J. saw Jakubik was on September 5, 2011.  Tr. 454.
After attending a concert with a friend, D.T.J. went over to her father's house and asked him for
some money, which he provided.  Tr. 454–55, 465–66, 509–10.

The next day, September 6, 2011, Schmirer and D.T.J. left Hungary and traveled to the
United States.  Upon their arrival in New York, D.T.J. and Schmirer moved in with Katalin
O'Toole in Haverstraw, New York, which is located in Rockland County.  Schmirer Decl. ¶ 6;
D.T.J. Decl. ¶ 2; Tr. 243.  They have lived at that residence from the time of their arrival in the
United States to the present day.  Tr. 190, 243–44.  D.T.J.'s cousin and godmother, Timea Deak,
who came over to the United States approximately a year after Schmirer and D.T.J., also lives
with them.  D.T.J. Decl. ¶ 2; Tr. 190–91, 395.  They also have relatives—Schmirer's sister, her
husband, and two children—nearby in Clifton, New Jersey.  D.T.J. Decl. ¶ 2; Tr. 397.

D.T.J. attended the eighth grade at Fieldstone Middle School during her first year in the
United States.  D.T.J. Decl. ¶ 3; Tr. 377.  She is now on summer vacation from North Rockland
High School, where she completed the ninth grade.  D.T.J. Decl. ¶ 3; Tr. 375, 378.  D.T.J. has
learned English quickly, has a number of friends, and performs reasonably well in school, where
she is enrolled primarily in courses for students who speak English as a second language.  *See*
PX 64; Tr. 162, 289, 376.  The family is supported by Katalin and John O'Toole, both of whom
are retired and receive monthly pensions, which together produce approximately $57,000 in
annual income.  John O'Toole also has savings of at least approximately $200,000.  Tr. 231–33,
254–55.

Since her arrival in the United States, D.T.J.'s only communications with Jakubik have
been through Facebook, through which communications have been extensive, and, on about
three occasions, on Skype.  *See* IX 6, 7; Tr. 483–85.  The tenor of the Facebook conversations,

which the Court has reviewed and which are described in more detail below, *see infra* pp. 35–37,

ranges from affectionate to extremely hostile, inflammatory, and abusive.

## IV.    Discussion

### A.  *Prima Facie* Case

Petitioner has made out a *prima facie* case by a preponderance of the evidence, as he

must under ICARA.  The parties do not dispute, and it was established at trial, that D.T.J. was

born in Hungary and lived there until age 13, thus meeting the definition of a "habitual resident"

of Hungary.  It is also undisputed that Schmirer brought D.T.J. to the United States without the

knowledge or consent of Jakubik, and that, according to the custody order of the Municipal

Court of Salgotarjan, Jakubik was to have visitation rights every other week.  D.T.J.'s abduction

by Schmirer, therefore, was in violation of Jakubik's custody rights under the Convention.  *See*

*Ozaltin v. Ozaltin*, 708 F.3d 355, 367 (2d Cir. 2013) ("[T]he Convention's broad definition of

rights of custody is not constrained to traditional notions of physical custody.  Instead, the

Convention recognizes the increasingly common exercise of joint legal custody, in which one

parent cares for the child while the other has joint decisionmaking authority concerning the

child's welfare." (citing *Abbott*, 130 S. Ct. at 1991 (other citations and alterations omitted)).

Although Schmirer conceded early in the case that Jakubik had made out a *prima facie*

case of wrongful removal, *see* Dkt. 7, D.T.J. initially made no such concession.  She argued

instead that Jakubik was not, in fact, exercising his custody rights at the time of removal.  The

basis for this claim was her assertion, noted above, that Jakubik frequently missed his scheduled

visitations with her.

The evidence on this point, however, sufficiently supported Jakubik.  Jakubik and his life

partner, Adrienn Viczian, both testified that D.T.J.'s visitations, prior to her departure for the

United States, occurred nearly every other weekend, as scheduled. And when asked by the Court approximately how many times she had visited with her father in the final two years before her departure for the United States, D.T.J. estimated the number to be about 30. Tr. 448. In addition, the ongoing custody proceedings in Hungary evince an interest—albeit perhaps sporadic—on Jakubik's part in securing custody of, or at least a more favorable custodial arrangement regarding, D.T.J.

On the eve of trial, presumably in light of a fuller appreciation of these facts, D.T.J.'s counsel, on her behalf, conceded that Jakubik had made out a *prima facie* case. *See* Joint Pretrial Order IV(a)(i). The Court agrees, and holds that, measured against the case law, Jakubik's lapses, if any, in visiting with D.T.J. do not disentitle him to relief. The standards applied to evaluating whether a petitioner is exercising custody at the time of removal are instead lenient: They have been held to require fairly minimal activity on the part of a petitioner. *See Souratgar v. Fair*, No. 12 Civ. 7797 (PKC), 2012 WL 6700214, at *4 (S.D.N.Y. Dec. 26, 2012) ("A person cannot fail to exercise [his] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)); *Croll v. Croll*, 66 F. Supp. 2d, 554, 560 (S.D.N.Y. 1999) ("Once the court determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts." (citation omitted)), *rev'd on other grounds*, 229 F.3d 133 (2d Cir. 2000), *abrogated by Abbott v. Abbott*, 560 U.S. 1 (2010) (holding that a statutory *ne exeat* right qualifies as a right of custody under the Hague Convention).

13

For these reasons, Jakubik has established a *prima facie* case of wrongful removal under the Hague Convention and ICARA. This case, therefore, turns solely on whether there have been established one or more affirmative defenses to the wrongful removal.

### B. Affirmative Defenses

#### 1. Article 12 "Settled" Defense

Schmirer and D.T.J. both argue that D.T.J. is well-settled in her new environment, and that returning her to Hungary for custody proceedings would therefore be harmful and disruptive. Jakubik does not dispute that the petition was filed in the United States more than a year after D.T.J.'s wrongful removal and that the Article 12 "settled" defense is therefore available. *See* July 17 Tr. 16. Nor is there any allegation that D.T.J.'s location was concealed from Jakubik subsequent to her arrival in the United States. To the contrary, Jakubik states that he became aware of D.T.J.'s location a few days after her arrival, in September 2011, through a public posting on Facebook. *See* Tr. 71; PX 49. The Court need not concern itself, therefore, with the issue, which has divided the federal courts of appeals and as to which the Supreme Court has recently granted certiorari, of whether equitable tolling applies to foreclose the availability of the "settled" defense in cases in which the child's location was concealed from the petitioner so as to cause the petition to be filed more than one year after the child's wrongful removal. *See Lozano v. Alvarez*, 133 S. Ct. 2851 (2013) (granting certiorari).[2]

---

[2] The Second Circuit has held that the one-year period is not subject to equitable tolling. It has explained that such equitable relief is "unnecessary," because the "settled" defense permits, but does not require, a Court to deny repatriation, and such a determination must be fact-specific: "Unlike a statute of limitations prohibiting a parent from filing a return petition after a year has expired, the settled defense merely permits courts to consider the interests of a child who has been in a new environment for more than a year before ordering that child to be returned to her country of habitual residency." *Lozano v. Alvarez*, 697 F.3d 41, 52 (2d Cir. 2012).

The Article 12 "settled" defense, which a respondent must prove by a preponderance of the evidence, grew out of the understanding of the framers of the Convention that "there could come a point at which a child would become so settled in a new environment that repatriation might not be in its best interest." *Blondin v. Dubois* (*Blondin IV*), 238 F.3d 153, 164 (2d Cir. 2001); *see also* Perez-Vera Report ¶ 107.  Therefore, even though it "effectively allows [a court] to reach the underlying custody dispute, a matter which is generally outside the scope of the Convention," *Blondin IV*, 238 F.3d at 164, the "settled" defense allows courts to examine the child's present situation and circumstances if more than a year has passed since his or her removal.  Article 12 does not define the term "settled."   However, courts have interpreted it to ask whether "the child is in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects."  *In Re Lozano*, 806 F. Supp. 2d 197, 230 (S.D.N.Y. 2011) (quoting *In Re Koc*, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001)); *see also Matovski*, 2007 WL 2600862, at *13 ("Respondent must marshal substantial evidence of the child's significant connections to New York." (citation omitted)).

Although there is no exhaustive list of the factors that are to be considered in assessing the "settled" defense, they include:  "[(1)] [T]he age of the child[;] [(2)] the stability of the child's residence in the new environment[;] [(3)] whether the child attends school or day care consistently[;] [(4)] whether the child attends [a religious establishment] regularly[;] [(4)] the stability of the [respondent's] employment[;] and [(5)] whether the child has friends and relatives in the new area."  *In Re Koc*, 181 F. Supp. 2d at 152; *accord Lozano*, 697 F.3d at 57; *Matovski*, 2007 WL 2600862, at *13; *Reyes Olguin v. Cruz Santana*, No. 03 CV 6299 (JG), 2005 WL 67094, at *8 (E.D.N.Y. Jan. 13, 2005).

### a. Age

D.T.J. is just a few weeks shy of 15 years old.  She participates in age-appropriate activities with her friends and already possesses aspirations for the future.  Although "courts are not in total agreement as to the existence of a correlation between age and degree of settlement," and "permutations and slides along the continuum" exist, courts have acknowledged that in certain cases, "the age of an older child might cut in favor of a finding of settlement if the child has few relatives, friends, and social involvement in his or her home country, and has them here." *Broca v. Giron*, No. 11 CV 5818 (SJ)(JMA), 2013 WL 867276, at * 6 (E.D.N.Y. Mar. 7, 2013).  In D.T.J.'s case, she appears to maintain ties to a few friends and relatives in Hungary, and the evidence showed that approximately half of her 1,000 Facebook "friends" are from Hungary.  However, it was evident, including from D.T.J.'s testimony, that the very substantial majority of her meaningful attachments are here in the United States.  *See, e.g.*, Tr. 390–92, 479–80, 507.  Unlike in the case of a young child, D.T.J.'s two years in the United States have occurred at a time in her life when she is acutely aware of her surroundings and able to form attachments and connections.  D.T.J.'s age is also relevant in the sense that she is in a critical period of academic development and social maturation.  Repatriating a child in the middle of his or her high school years is, arguably, more disruptive than repatriating a very young, and less emotionally aware, child.

The Court finds that this first factor, that of age, supports D.T.J.'s "settled" defense.

### b. Stability of Environment

D.T.J. has remained in one home for the entirety of her time in the United States, *i.e.* with the O'Tooles of Haverstraw, as attested to by Schmirer and O'Toole.  *See* Tr. 190, 244.  Her mother has no plans (nor incentive nor evident opportunity) to move away.  *See* Tr. 250–51.

D.T.J.'s grandmother represented that D.T.J. and her mother could stay for "as long as they want." *See* Tr. 237.

This fact plays a significant role in the "settled" inquiry. *Compare Matovski*, 2007 WL 2600862, at *13 (finding a "stable environment" where "children . . . have lived in the same home since arriving in New York, and there is no evidence that this will change soon"), *with In Re Koc*, 181 F. Supp. 2d at 154 (child not well-settled due to having moved to "three new schools and three new homes in less than three years"). D.T.J. "feel[s] safe with [her] family here and trust[s] that they love [her] and will take care of [her]." D.T.J. Decl. ¶ 10. D.T.J. attested: "I am so happy and things are so normal here[;] my heart is very happy for the first time in my life." *Id.*

In her testimony, D.T.J. very credibly presented as extremely content with her living situation. Testimony from D.T.J., O'Toole, and Schmirer all described close family bonds and a stable, comfortable home environment. D.T.J. described spending time with her family members cooking, shopping, and translating for the members of the household who do not speak the same language. They are also frequently visited by Schmirer's sister and her family, who reside in New Jersey. D.T.J. also credibly testified about the strength of her friendships in the United States, and repeatedly returned to this subject, in a way that left no doubt about the depth of her affection for her friends and family in the United States. *See, e.g.*, Tr. 375, 378, 392, 479–80, 507.

In sum, by all accounts, D.T.J.'s environment here in the United States is a stable and happy one. This finding goes far in bolstering Respondent's and D.T.J.'s "settled" defense.

### c.  School Attendance

D.T.J. regularly attends school here in the United States. She graduated from the eighth

grade at Fieldstone Middle School; this past year, she completed her ninth-grade year at North Rockland High School. D.T.J.'s attendance records indicate just six unexcused absences over the course of this past school year. *See* IX 15. D.T.J.'s teachers described a motivated student whose English has improved markedly over the course of the year, and who evolved from a shy and quiet student to an outgoing, gregarious, and well-adjusted one. *See* Tr. 163–64, 290–92, 294. D.T.J.'s impressive facility with the English language and outgoing personality were evident to the Court in the several hours of testimony conducted. During this time, D.T.J. required the assistance of the translator on only a handful of occasions, and mostly to deal with discrete or idiomatic phrases. The Court's perception is that, although she retains a discernible accent, her facility with the English language is today already well within the middle of the bell curve of 9th graders in the United States.

D.T.J.'s testimony about school was overwhelmingly positive. She testified that she is delighted with her teachers, has a multitude of friends, and is very excited to begin tenth grade. Tr. 375. D.T.J.'s report card indicates that she passed all of her classes, with grades ranging from 75 to 95, and that she is academically on a strong upward trajectory. *See* PX 64. In December 2012, she achieved a "Rising Raider" award from her school, a certificate given "for [her] continuing dedication to academic achievement." *See* IX 28; Tr. 460. D.T.J. also attends extra English classes after school. Tr. 382. She describes herself as serious about her studies; in fact, she dreams of "going to . . . Stanford University and . . . would like to become a lawyer." Tr. 380–81. Schwartz testified that D.T.J.'s "level of enthusiasm for learning is much greater than the majority of [her] students" and that D.T.J. is "just a sponge" who "wants to learn." Tr. 298.

Although Petitioner argued on several occasions that D.T.J. would be meeting with

greater academic success in Hungary, that fact was not clearly established.  Nor is the Court

persuaded that, even if it were established, it would detract from the finding that D.T.J.'s school

attendance and life at school is a component of her being "well-settled" in the United States.

This factor, too, strongly supports a finding that D.T.J. is "settled" here.

### d.  Friends and Relatives

D.T.J. testified to being extremely close with her relatives in the United States.  In

addition to her cousin and godmother Timea Deak, she stated that she has a close relationship

with her grandmother's husband, with whom she "talk[s] every day" and without whom she

"do[es]n't know what [she] would do."  D.T.J. Decl. ¶ 2; see Tr. 394.  In addition, D.T.J.'s aunt,

uncle, and cousins reside nearby and "come over for family dinners."  D.T.J. Decl. ¶ 2.

D.T.J. speaks about a group of very close friends she has made in the United States, with

whom she regularly takes trips to the mall, has sleepovers at her house, watches movies, and

goes swimming.  Tr. 378–79, 383–86.  D.T.J.'s yearbook messages, see IX 16, and photographs

of herself with friends submitted as exhibits to her declaration, corroborate this testimony.  They

help confirm that she has meaningful attachments to numerous friends in the United States, and

that these relationships are quite important to her.  D.T.J. is justifiably proud of the progress she

made socially, describing herself as "popular" and chatty with friends.  Tr. 378.  This description

was corroborated by her teachers' testimony.  See Tr. 165, 290.  D.T.J. has, no doubt, created

deep social connections in the United States.

To be sure, Jakubik has demonstrated that D.T.J. maintains a close relationship with a

few family members and friends in Hungary, too.  He has adduced evidence that D.T.J. misses

those relatives.  See, e.g., PX 17, 21–22, 49; Tr. 399–401, 413–14, 468, 471–72.  The Court

credits that testimony too.  Still, although D.T.J. undoubtedly still has some ties to Hungary and

misses her friends and relatives there, she repeatedly, unwaveringly, and passionately testified

that she regards her family and social sphere, at this time in her life, as centered in New York.

*See* D.T.J. Decl. ¶ 2 ("Haverstraw is where my family is; Haverstraw is my home."); Tr. 507

("My future is here.  My friends, my college, my life.  And everything is here for me.").

 This factor, therefore, also strongly supports the "settled" defense.

### e.   Respondent's Employment

Schmirer is not employed in the United States, nor is any member of the household in

which D.T.J. lives.  *See* Tr. 213, 231, 254–55, 396.  That fact, viewed in isolation, undercuts

D.T.J.'s and Schmirer's claim that D.T.J. is "settled."  At the same time, there was evidence of

continuing financial support for D.T.J. from means other than presently earned income.  The

evidence at trial established that Schmirer and D.T.J. are supported financially by John and

Katalin O'Toole, who receive a combined monthly pension of approximately $4,870.  Tr. 231–

32, 254–55.  In addition, Katalin represented that her husband has a bank account for his savings,

estimating that it contained at least $200,000, Tr. 233, and that the O'Tooles own their home, Tr.

189.  D.T.J. testified that she always feels there is enough money for the things she needs or

wants.  Tr. 396–97.

Schmirer's lack of employment or income certainly undercuts the "settled" defense here.

It is mitigated somewhat by the financial assistance provided to Schmirer and D.T.J. by the

O'Tooles.  *See Matovski*, 2007 WL 2600862, at *14 ("[T]he importance of respondent's

consistent employment is diminished due to the fact that they are financially supported by their

grandparents, with whom they live.").  Furthermore, it appears that Schmirer and D.T.J. are more

financially stable in the United States than they were in Hungary.  *See* Tr. 480.  As Petitioner

validly points out, however, the family members are entirely dependent on this support, which

presents a somewhat precarious situation.  The O'Tooles are in their 70s and John O'Toole is in frail health.  Should they pass away, the three Hungarian residents of their household (D.T.J., Schmirer, and Deak) would be left without any source of income, and to live on any inheritance they might receive from the O'Tooles.

This factor, therefore, points in conflicting directions as to the "settled" defense.

### f.   Immigration status

It is undisputed that both Schmirer and D.T.J. are living as undocumented persons in the United States.  The consequences of this status present an obstacle to Schmirer and D.T.J.'s ability to demonstrate that D.T.J. is well-settled in the United States.

The Second Circuit has squarely held that lack of legal immigration status does not preclude a court from finding that the "settled" defense has been established.  *See Lozano*, 697 F.3d at 56 ("[I]mmigration status should only be one of many factors courts take into account when deciding if a child is settled within the meaning of Article 12. . . . [I]n any given case, the weight to be ascribed to a child's immigration status will necessarily vary."); *see also Broca v. Giron*, No. 13-1014-cv, 2013 WL 3745985, at *1 (2d Cir. July 18, 2013) ("The ['well-settled'] test is a 'fact-specific multi-factor' test, in which no factor, including immigration status, is dispositive."); *Demaj v. Sakaj*, No. 3:09 CV 255(JGM), 2012 WL 476168, at *4 (D. Conn. Feb. 14, 2013) (noting that "the idea that immigration status should render an otherwise settled child not settled [has been] rejected" by many courts); *accord In Re B. del C.S.B.*, 559 F.3d 999, 1010 (9th Cir. 2009) ("We can see nothing in the Convention itself, in our case law, or in the practical reality of living in this country without documented status, to persuade us that immigration status should ordinarily play a significant, let alone dispositive, role in the 'settled' inquiry. . . . Neither text nor history suggests that lawful immigration status is a prerequisite, or even a factor of great

significance, for a finding that a child is 'settled' in a new environment.").  The factors to be considered when assessing the relative weight that should be given to a child's immigration status include "the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits."  *Lozano*, 697 F.3d at 57.

Jakubik argues that, for several reasons, D.T.J.'s immigration status should weigh heavily in the balancing of the "settled" factors.  Jakubik point out that D.T.J.'s immigration status, if unchanged, will:  (1) prevent her from receiving most government benefits; (2) make it difficult, if not impossible, for her to obtain a postsecondary education (which D.T.J. has repeatedly represented she plans to pursue and is of great importance to her); and (3) render D.T.J. unable to obtain a driver's license which, Jakubik asserts, would "prevent[ her] from participating fully in economic and social activities," including, for example, obtaining employment, opening a bank account, and renting an apartment.  Jakubik Immigration Br. 3 (Dkt. 30).  Jakubik also points to the hurdles to D.T.J.'s obtaining lawful residency status, including the inevitable delay that would attend any application for residency as a "derivative beneficiary" (which might moot D.T.J.'s eligibility should the process last until D.T.J. reaches age 21); and factual and jurisdictional complications that would arise should D.T.J. apply for special immigrant juvenile status ("SIJS"), described more fully *infra*.  Furthermore, whether or not D.T.J. is likely to be deported, Jakubik argues, "the uncertainty and anxiety that one day INS could come knocking on D[.T.J.]'s door" means that "D[.T.J.] will always have to live with fear whenever she seeks to participate in economic or social activities."  *Id.* at 7–8.

Schmirer and D.T.J. respond by pointing to the possibility of D.T.J.'s obtaining SIJS or becoming a lawful resident as a derivative beneficiary.  Furthermore, they argue that it is not

likely that they will be deported, because factors bearing on the exercise of prosecutorial discretion make them a low-priority target for removal efforts.  They also note that, even as undocumented, D.T.J. remains eligible for free public education and free public health insurance.  Thus, they argue, D.T.J.'s status "does not adversely affect her health, safety, or welfare."  D.T.J. Immigration Br. 5 (Dkt. 19).

On this subject, the Court had the benefit of hearing testimony from Professor Lenni Benson, a professor of law at New York Law School specializing in immigration law.  Professor Benson testified as an expert in immigration law and practice with a specialization in immigration applications and remedies for children and relatives.  Her testimony confirmed that there are, in fact, potential avenues by which D.T.J. could normalize her status.  Professor Benson described these processes in detail.  Tr. 522–41.

The first potential method would involve Katalin O'Toole, a lawful permanent resident, bringing a petition for Schmirer to become a lawful resident, as an unmarried child of a permanent resident.  If that petition were successful, D.T.J. would obtain legal status derivatively through it, provided it occurs before she reaches the age of 21.  This method of obtaining legal status is called a "second preference, family-based petition, category B" (which would convert into a "first preference family-based petition" should O'Toole naturalize while the petition is pending).  Tr. 522, 526.  Alternatively, Benson noted the possibility of D.T.J.'s obtaining SIJS. *See* 8 U.S.C. § 1101(a)(27)(J).  This would require a court to exercise jurisdiction over D.T.J. in some form of family court proceeding, to make certain factual findings, and then to make special immigrant juvenile findings.  Tr. 532–37.  From there, a petition for special immigrant juvenile status can be brought, along with an application to adjust status to permanent resident, and

Professor Benson testified that, at that point, "the child would almost without a doubt become a permanent resident."  Tr. 540–41.

On cross-examination, Petitioner highlighted several obstacles that may prevent these methods from resulting in D.T.J.'s obtaining lawful status.  One is the Uniform Child Custody Jurisdiction and Enforcement Act, which prevents a New York court from exercising jurisdiction over a custody matter, in many, if not most, instances, when a custody matter relating to the same child is pending in a foreign jurisdiction.  *See* Tr. 542.  Another is the possibility that D.T.J. may prove unable to satisfy the factual findings required for SIJS, including the required finding that reunification with "one or both" parents not be viable; this requirement has been alternatively interpreted as conjunctive or disjunctive.  *See* Tr. 546–48.  A third is the lengthy delay (on average, between six and eight years) between when a petition for a second preference family-based petition is filed and when it is granted.  *See* Tr. 557–60.

The Court recognizes and does not minimize the obstacles presented by the pathways to legal status proposed by D.T.J.  D.T.J. has expressed a desire to attend college and perhaps law school and to develop a professional career.  Unavoidably, she will face substantial challenges as an undocumented immigrant that she would not be faced with should she return to Hungary, where she would likely be able to obtain postsecondary education more easily.  Although there are possible avenues of legalizing her status, they appear to be fraught with complications.  The Court is persuaded, on the other hand, by Professor Benson's opinion testimony that D.T.J. is highly unlikely to be deported.  *See* IX 19 ("It is my . . . opinion that the child and her mother face an extremely low possibility of removal.  Should removal be initiated, both D.T.J. and Eva Schmirer would likely qualify for a positive exercise of prosecutorial discretion deferring their removal.").  In other words, although the process of normalizing D.T.J.'s status is likely to be a

long one and although it is by no means assured of success, D.T.J. is not at all likely to be removed from the United States.  During the past 15 years, Schmirer and D.T.J. have repeatedly demonstrated admirable resilience and resourcefulness, in the face of daunting obstacles.  During the challenging years to come, these traits will undoubtedly be called on again.

On balance, D.T.J.'s immigration status unavoidably points against a finding that she is "settled."

However, notwithstanding this factor, balancing all of the foregoing "settled" factors, the Court is persuaded—overwhelmingly—that D.T.J. has met this affirmative defense by a preponderance of the evidence.  Indeed, she has proven it by far more than a preponderance.  The first four factors compellingly favor a finding that D.T.J. is settled in the United States.  Indeed, given the tragic and heart-rending turbulence of her former life in Hungary, the Court concludes that she is today settled for the first time in her life.  Her acclimation and assimilation to the United States are in fact exceedingly impressive.  Having spent some four hours interviewing D.T.J., having heard testimony from her teachers and members of her household, and having reviewed documentary evidence of her ties to her friends in the United States, it is hard for the Court to conceive of a child who arrived in the United States less than two years ago from a foreign land and without material English-language skills appearing more settled than D.T.J. The Court makes this finding fully mindful that two factors detract from this finding:  Schmirer's lack of employment and D.T.J.'s and Schmirer's immigration status (the former of which derives from the latter).  The Court joins the various courts in this Circuit that, applying this multi-factor test, have held that a child without lawful status was nevertheless "well-settled."  *See Broca*, 2013 WL 3745985, at *1; *Lozano*, 697 F. 3d at 56; *Demaj*, 2012 WL 476168, at *4.  D.T.J. is well-settled in the United States and this Court comfortably so finds.

## 2.   Article 13 "Age and Maturity" Defense

The Court has also given close consideration to whether D.T.J. is of a sufficient age and maturity that the Court should take into account her "considered objection to returning."  *Blondin IV*, 238 F.3d at 166.  A court may refuse repatriation "solely on th[at] basis."  *Id.*; *see Broca*, 2013 WL 867276, at *9–10; *Matovski*, 2007 WL 2600862, at *9; *de Silva*, 481 F.3d at 1286.

As noted, the Court spent several hours in conversation with D.T.J., covering a wide range of subjects.  The Court listened closely to D.T.J. during this conversation, pursued numerous lines of inquiry, and was also attentive to her body language.  This conversation enabled the Court to obtain an informed perception of her maturity level.

The Court viewed D.T.J. as reasonably mature for an almost 15 year-old.  To be sure, the Court perceived noticeable areas of emotional immaturity.  For example, D.T.J.'s answers in certain instances revealed a willingness to make sweeping, absolute statements, and a degree of dogged refusal to reexamine conclusions she had drawn or statements she had made.  The Court noted this, in particular, in the case of the following two exchanges.  The first occurred after D.T.J. and the Court had reviewed Facebook messages that she sent shortly after her arrival in the United States, which indicate a degree of homesickness or sadness:

> Court: Is it safe to say from these e-mails that for a while after arriving in the United States you wished you were back in Hungary, and then you changed your mind?
> D.T.J.: Yes.
> Court:  OK.  And, in other words, at the time you thought you would be happier in Hungary than the United States, and then you changed your mind?
> D.T.J.: Yeah.  And, you know, when I changed my mind, after like three or four months, I just realized that in Hungary almost everyone was fake for me.
> Court: You mean your friends were fake.
> D.T.J.: Yeah.
> Court: And that's why changed your mind?

> D.T.J.: Not this one.  Everything was changing my mind.  Because I got friends, and I started to learn the language.
> Court: Are there any friends you have in the United States who are fake?
> D.T.J. Yeah.  Oh, you mean here? No.
> Court: No friends are fake here?
> D.T.J.: No.
> Court: Are there mean friends here too?
> D.T.J.: You know, not mean friends. . . . .
> Court: [I]t sounds like your experience looking back is that you think of Hungarian kids your age as either fake or mean, but you don't feel that way much about American kids your age.  Is that accurate?
> D.T.J.: Yes.

Tr. 479–80; *see* PX 49.

Another such instance was D.T.J.'s statement that her father started hating her "when [she] was born."  Tr. 441.  D.T.J. was unable, or unwilling, to articulate precisely her reasons for thinking that.  All the evidence is the contrary:  Jakubik compellingly testified about his love for his daughter; his communications (even if shockingly abusive at times) also clearly reveal his love for D.T.J.; and with Jakubik and Schmirer having cohabited during the first nearly six years of D.T.J.'s life, the circumstances supply no basis for D.T.J. to intuit that her father hated her from the moment of birth.  The proposition is inexplicable.  However, when the Court pursued these points with D.T.J., she was unwilling to qualify or reconsider her statements.  Quite the contrary, she dug in on them.  It appeared to the Court that D.T.J. had concluded that claiming that (1) Hungarian children are mean and fake whereas American children are not, and (2) her father had hated her from birth, might strategically assist her bid to remain in the United States.  The Court has considered whether these implausible responses by D.T.J. should be viewed not as a sign of immaturity, but as a product of her testifying in her newly acquired second language or of the inherent awkwardness of giving testimony to a judge.  The Court concludes instead that D.T.J.'s adherence to these surprising statements reflected a degree of emotional immaturity, as

well, it must be noted, as a misplaced strategic assumption that making such broad denunciation of things Hungarian might lead the Court to deny Jakubik's petition for her return.

That said, the vast majority of the evidence revealed D.T.J. to be a mature, thoughtful child with age-appropriate analytic skills and assessments of reality. D.T.J.'s maturity was particularly evident with respect to two topics. First, D.T.J.'s articulation of her reasons for wanting to stay in the United States was rational and reasoned. Her comments demonstrated that a mature and considered line of thinking had led her to this conclusion, and reflected a practical, sober sensibility. D.T.J. explained that she preferred the United States because her emotional and tangible needs are being met here, whereas they were not being met in Hungary. Her reasons for not wanting to go back, she stated, were "[n]ot because of this case" but because "it's better here." Tr. 401. When asked what would happen if she were returned to Hungary, D.T.J. responded: "We [would] be poor as before, and [would] not find any job, because in Hungary, . . . we have no jobs." Tr. 506–07. She demonstrated that she feels safe and secure in the United States, and that she sees a brighter future here for herself, stating: "My future is here. My friends, my college, my life. And everything is here for me." Tr. 507. In addition, she acknowledged that the support of her family and friends were crucial to her success here.

The second revealing example of her emotional maturity came during D.T.J.'s discussion of her immigration status. D.T.J. demonstrated quite bluntly that she is aware of the challenges presented by her immigration status should she remain in the United States. She was able to enumerate some of these challenges, including that she cannot obtain a driver's license, will have difficulty affording college, and cannot get a job. Tr. 505. Here, D.T.J. demonstrated a mature sequence of reactions, first identifying these limitations, and then commenting:

> [Y]ou know, it doesn't make me feel bad. I'm a little bit afraid of it, but I hope I
> can fix my papers as soon as possible. . . . My lawyers say that maybe I can get a

> green card, maybe, just maybe . . . . I am not a hundred percent sure.  My lawyer
> is not a hundred percent sure.  But maybe she can do it for me.

Tr. 505–06.

The Court is comfortable basing this conclusion on the lay testimony it received and its

own considered perceptions of D.T.J. following the lengthy interview in chambers.  D.T.J. is an

impressive young woman whose views merit respect.  These conclusions are reinforced,

however, by the testimony of Dr. Mark Rand, who testified as an expert in child psychological

evaluations and forensic evaluations of children and adolescents.  Having interviewed D.T.J. for

nearly four hours, Dr. Rand found D.T.J. to be of an emotional maturity level "within the normal

range" for her age, and that she "has a developed sense of her own emotional and psychological

needs and preferences."  IX 17.  Dr. Rand acknowledged that D.T.J. also showed a

"regressiveness" as demonstrated by D.T.J.'s forceful hugging of her mother.[3]  But this, he

stated, was "associated with children who have witnessed domestic violence, once they move

into adolescence there is this resurgence of the separation issues that you might have found

during the toddler preschool days."  Tr. 579.  The Court credits Dr. Rand's assessment that

D.T.J. showed age-appropriate maturity.

The Court has carefully considered whether, because D.T.J. has been in the exclusive

custody of her mother since 2011, and the two admitted to having begun to discuss leaving

Hungary months before that, her testimony should be viewed as the "product of undue influence,

in which case the child's wishes should not be considered."  *Tsai-Yi Yang v. Fu-Chiang Tsui*,

499 F.3d 259, 279 (3d Cir. 2007); *accord Matovski*, 2007 WL 2600862, at *10.  Petitioner's

counsel urged this conclusion, and the Court concludes, based on the assembled record, that

---

[3] The Court observed similar clinginess by D.T.J.—at each break in her testimony, she clung
strikingly vigorously to the upper arm of one of her attorneys as she exited the Court's robing
room.

Schmirer is a strong proponent of remaining in the United States and has communicated as much to D.T.J. That said, D.T.J.'s fervently expressed opinions, and her desire to remain in the United States, appeared clearly to be entirely her own. The Court concludes that D.T.J.'s desire to remain in Haverstraw and not to return to Hungary is the product of reasoned consideration of relevant facts.

Finally, the Court notes that, although not an independently significant factor in assessing D.T.J.'s freestanding Article 13 defense, D.T.J. is just over one year shy of aging out of the Convention, which ceases to apply to children over 16 years of age. *See* Hague Convention, art. 4. In the Convention's Explanatory Report, Perez-Vera notes that "it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will." Perez-Vera Report ¶ 30.

The Court finds that D.T.J. has successfully made out an Article 13 affirmative defense. She is of sufficient age and maturity that the Court should take into account her views and objection to repatriation. This defense independently justifies denial of the Petition.

### 3. Article 13(b) "Grave Risk" Defense

The "grave risk" affirmative defense in this case presents a far closer question than do the "settled" and "age and maturity" defenses discussed above, largely due to the more demanding burden of proof. Schmirer and D.T.J. argue that, should D.T.J. return to Hungary, she would be at grave risk of harm, as defined by Article 13(b) of the Convention. Specifically, they argue, D.T.J. would incur psychological damage, occasioned by her proximity to a violent and abusive father; and be at risk of sexual abuse at the hands of her father. Petitioner disputes these claims that such harm would ensue. Petitioner argues that any risk of trauma caused by the return of D.T.J. to Hungary is not materially greater than the disruption inherent in repatriation of a child;

and that to the extent Schmirer and D.T.J. raise claims relating to Petitioner's conduct,  the Hungarian courts are better equipped than this Court to assess and manage any risk presented by D.T.J.'s contacts with her father in Hungary.  Petitioner therefore argues that Schmirer and D.T.J. have not met the clear and convincing burden of proof required to make out a "grave risk" defense.

"The level of risk and danger required to trigger th[e grave risk] exception has consistently been held to be very high."  *In Re Lozano*, 809 F. Supp. 2d at 220 (citing *Norden-Powers v. Beveridge*, 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000)).  The Second Circuit has repeatedly emphasized that, to prevail on the "grave risk" defense, there must be "evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation . . . . The person opposing the child's return must show that the risk to the child is grave, not merely serious."  *In Re Lozano*, 809 F. Supp. 2d at 221 (citation omitted); *see also Laguna v. Avila*, No. 07-CV-5136 (ENV), 2008 WL 1986253, at *8 (E.D.N.Y. May 7, 2008) ("In this Circuit, . . . even incontrovertible proof of a risk of harm will not satisfy the Article 13(b) exception if the risk of harm proven lacks gravity.  Cases that have approved invocation of the Article 13(b) exception have focused on evidence of a sustained pattern of physical abuse and/or a propensity for violent abuse." (citation omitted)).

Here, D.T.J. and Schmirer make two arguments as to why D.T.J. would be at grave risk of great harm were she to be returned to Hungary: (1) that D.T.J. will suffer great psychological trauma should she be repatriated so as to be in proximity and contact with her father; and (2) that Jakubik has sexually abused D.T.J. in the past and would do so upon her return. The Court finds

by clear and convincing evidence that D.T.J. has met this standard, but only as to the first of these two theories of harm.

The Court is persuaded that D.T.J. will experience psychological trauma apart from and beyond the disruptions inherent in repatriation. The evidence at trial convincingly showed that Jakubik can be a brutal, violent, jealous and possessive man. It established that, while Schmirer resided in Hungary, Jakubik repeatedly engaged in horrific acts of violence towards Schmirer. These incidents were recalled most vividly by Schmirer, but D.T.J. recalled a number of them as well. The Court paid close attention to both witnesses as they testified, and fully credits both witnesses' testimony as to these incidents. The incidents included the following.

Around the time that D.T.J. was four years old, when Schmirer and Jakubik were still cohabiting, Schmirer left early in the mornings to go to work. On one occasion, Schmirer testified:

> The evening before he [Jakubik] filled up the bath tub with cold water, he took all my clothing and also my jackets and winter coats, and he threw them into the bathtub. I tried to rescue from his hands some of my clothes, because I knew otherwise in the morning I'm not going to be able to put anything on. And then he tried also to push me into the water myself. And the child was there and tried to defend me. She was crying and begging "[L]eave mother alone". . . . And I was struggling to get away, and I was kicking because he is taller than me and stronger than me. He grabbed me . . . and threw me into the bathtub, and D[.T.J.] was screaming . . . "[D]on't do it." He tried to push [her] out of the bathroom. She fell backwards [i]n the hallway . . . .

Tr. 263–64. D.T.J. recounted the same incident. She recalled that "the first memories of what [she] remember[s]" with regard to her father "is when he was pulling [her] mother under the water, and [she] went inside, and [she] just saw [her] father, he pushed [her] out with his leg, and he just closed the door." Tr. 415.

On another occasion, Jakubik tried to hit Schmirer, who attempted to grab D.T.J. and run away:

32

> Before I could grab D[.T.J.], he managed to grab my hair, and he was trying to push me onto the bed.  And the way he was pushing me, I fell on this ceramic oven, and I burned myself. . . . It was a terrible pain, and it was a very, very long time that I felt it. . . . First there were plenty of blisters, and then they broke up and liquid was coming out. . . . I couldn't go to a doctor.  He wouldn't allow me, because he wanted to avoid that people ask how did it happen.

Tr. 266.

> Another time, Schmirer testified:

> [W]e were just having supper, and as I was eating, the spoon touched—as I was eating, the spoon touched my teeth, and he hated it.  He really hated it.  He started to scream like a maniac, that I shouldn't do this ever again. . . . I got up and went into my room.  And I was screaming and he came also after me in the room.  He picked me up and threw me right into this glass door. . . . I got cut terribly in this glass.

Tr. 268–69.  Consistent with this testimony, O'Toole recalled Jakubik's visceral distaste for the sound of a spoon against teeth, mentioning it in her testimony, albeit in connection with a different incident.  *See* Tr. 204.

In other instances, Jakubik threw Schmirer on the bed and punched her ear, leaving a scar; or punched her in the mouth, breaking a tooth, which then had to be extracted by the dentist, leaving her with a missing tooth.  Both the scar and the missing tooth are still visible today.  Tr. 267, 271.  During all of these incidents, Schmirer testified, D.T.J. was present.  Tr. 269.  D.T.J., who was very young, understandably recalls only some of those incidents.

One such occasion that both Schmirer and D.T.J. recall involved the three of them on a car trip.  Jakubik at some point stopped the car, took out a knife for glass-cutting, and threatened to slit Schmirer's throat.  *See* Tr. 272–73, 430–31.

Jakubik's abuse was not simply aimed at injuring Schmirer, but at demeaning her as well.  Both O'Toole and Schmirer testified to a sick "game" that Jakubik enjoyed playing. Schmirer described this game on the stand:

> [H]e would push me down on the ground.  I would fall down on my belly.  Then when I was already on the ground, he would grab my two feet, and he did it especially very often when I pregnant, and I was scared I was going to lose my pregnancy.  I was always very skinny, and I was afraid that I'm not going to have enough strength to hold myself on my hands and I'm going to fall on my protruding belly.  And I was holding myself on my hands because, as I said, if I don't hold tight my arms, then I'm going to fall with my weight on the baby.  He found very humourous. . . . [H]e was laughing, and he was saying "you little pig."  He was pushing my feet, and I had to walk on my hands. . . . He did it very often, and he did it when we were alone or in front of his friends, or even in front of his mother.

Tr. 277–78.

Also significant, as noted, on D.T.J.'s seventh birthday, Jakubik kidnapped her against Schmirer's will, and during the ensuing 10 months, he refused to return her to Schmirer.

Schmirer did not see her for half a year:

> When I finally saw her I could see her only through terrible efforts.  So one day [Jakubik] came to pick me up and he told me I'm taking you to meet D[.T.J.].  He said I have to stop by a gas station because the gas was very cheap and he ran out of gas and he has to stop over and continue.  He was very disheveled.  I climbed in the car next to him with the hope that I am going to see my daughter. . . . I got out of the car.  There was nobody home. . . . He told me D[.T.J.] is not here.  Then he said, if you sleep with me, then I am going to give you the daughter, lovemaking.  I can't even tell you how disheveled he was.  He was so dirty.  . . . And I had to do it.  I had to do it.  And afterwards, he was laughing big time, and still today he talks about it and considers it a major joke.  He reminds me always by saying, you remember when I took that gas for 10 forints.  I have to know and understand what he means.

Tr. 283–84.

In considering whether Schmirer and D.T.J. have established this defense, the Court is mindful that the relevant issue is whether the evidence establishes a grave risk to *D.T.J.*, who, as both Schmirer and D.T.J. conceded at trial, was never physically assaulted by Jakubik.  *See* Tr. 455–56.  The law is clear that "[e]vidence of . . . incidents aimed at persons other than the child at issue, have not been found sufficient to support application of the 'grave risk' exception." *Laguna*, 2008 WL 1986253, at *8; *accord Souratgar*, 2013 WL 2631375, at *4 ("Spousal abuse .

34

. . is only relevant under Article 13(b) if it seriously endangers the child.  The Article 13(b)

inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but

whether so doing would subject the child to a grave risk of physical or psychological harm. . . .

[L]imited incidents aimed at persons other than the child, even if witnessed by the child, have not

been found to constitute a grave risk."); *In Re Filipczak*, 838 F. Supp. 2d 174, 180 (S.D.N.Y.

2011); *Rial v. Rijo*, No. 10 Civ. 1578 (RJH), 2010 WL 1643995, at *2–3 (S.D.N.Y. Apr. 23,

2010); *Lachman v. Lachman*, No. 08 Civ.4363 (CPS), 2008 WL 5054198, at *9 (E.D.N.Y.

Nov. 21, 2008).  The Court is also mindful that the incidents chronicled above all occurred prior

to the point in 2006 when the Hungarian Court in Salgotarjan made its custody determination.

Fully aware of Jakubik's history of violence towards Schmirer, that court, for reasons that this

Court is not permitted to second-guess, put in place the current custody regime, under which

Jakubik has visitation rights with D.T.J. on alternating weekends.  *See* PX 2 at 2.

Significantly, though, the evidence at trial reveals that Jakubik has maintained a torrent of

verbal abuse towards D.T.J.  Since her arrival in the United States, Jakubik and D.T.J. have

remained in contact via Facebook, and voluminous evidence of their Facebook communications

since mid-2012 was admitted at trial.  This evidence revealed a series of diatribes by Jakubik

towards D.T.J., both in Facebook messages to her personally and in "wall postings" to which she

and other users had access.  On May 4, 2012, for example, Jakubik wrote to D.T.J.:

> It's your mother who doesn't care about you because taking you there was for her
> own good and not yours.  But Interpol will be looking for you soon, because what
> your mother did was a crime, but I guess she is aware of that . . . .  Do you
> remember when you went to that fucking gypsy country you had asked for pocket
> money the night before?  You asked for money and I gave you some.  I gave you
> more than you asked for, but I'll leave this to your conscience.  You can write
> nasty things, but I love you because I'm your father.  I'll try my hardest to have
> you brought back home before summer and just so you know I have a good
> chance.  Once you are home, we will have a talk! . . . . [T]ell her to come back to
> her senses and put you on a plane because I will have her imprisoned if I have to.

IX 6 at DTJ0131–DTJ0132.  In an October 2, 2012 conversation, Jakubik taunted D.T.J., "I will put your dickhead mother where she belongs because I made a vow at my father's grave. :) . . . So when your Mom comes home, the same thing will happen as I wrote before.  (She will die like a bum under a gate and no one will give a crap about her)."  *Id.* at DTJ0141, DTJ0143.  As recently as a few weeks ago, Jakubik told D.T.J. that "Your fucking mother wanted to raise you to be a whore."  *Id.* at DTJ0190.

Jakubik's Facebook "wall postings" consist of similarly profane invective.  In one post, he stated:

> I am telling the entire lousy (Schmirer) family that you, rotten scums cannot hide; Uncle Gyula will find you and then you will get yours.  You took my daughter away to suck [cocks] like a pig, I hope you know what sucking means (rotten scums).

IX 2 at DTJ0117.

In another, he wrote:

> God bless you all named Katalin, except Janosne Schmirer, alias Katalin Takacs, for whom I'd like to send my good wishes separately!  In case somebody doesn't know, she is the rotten mother of Eva degenerate Schmirer, or what a shit.  My good wish, dear Mama Kati, goes like this: live 100 years more in misery, poverty, and lastly, in shame.

*Id.* at DTJ0117.  Jakubik's communications and postings also contain substantial anti-Semitic invective, notable given that D.T.J. is of partially Jewish ancestry on her mother's side.  *See* Schmirer Decl. ¶ 7.  One such posting rails:

> I should fuck and impregnate all those dick-waving dogs, who sit in the Parliament pissing away assets belonging to me and to millions of other patriots. These Jewish henchmen don't balk at anything, when they rob our sweet homeland.  They want secrecy?  I would give it to them: about 2 meter deep in horizontal position; you cock-sucker Romanian-Gypsy Orban scum, why don't you ruin your fucking bitch mother and your lousy Jewish henchmen lackeys? You will be very much fucked because of this.

IX 2 at P2.  In another, Jakubik exhorted, "Into the Danube with the Jews."  IX 34.  D.T.J.

testified that Jakubik's anti-Semitic statements were "bad for me because I think I am Jewish."

Tr. 502.

Finally, although not accessible to D.T.J., Jakubik, in the days before trial, engaged in

Facebook communications with a third party (who went by the name "Jack Al") in which he

expressed similarly violent intentions.  In a post sent apparently after he arrived in New York to

testify in this case, he stated that he would like to disembowel Schmirer.  Tr. 106.[4]

D.T.J.'s testimony clearly revealed deep distress at Jakubik's abusive writings.  She

testified that returning to Hungary and to contact with her father would be traumatic for her.  *See*

Tr. 502–03; D.T.J. Decl. ¶ 34.  D.T.J. stated on more than one occasion during her testimony that

she had very real fears about her father killing her mother.  *See, e.g.*, Tr. 407, 499.  She voiced

fear that "[m]aybe if we have to go back to Hungary, I think he will do it."  *Id.* at 499.  D.T.J.

remembered that Jakubik had said that "[h]e would put handcuffs on everybody in the family and

he would shoot them in the head."  *Id.* at 408.  D.T.J. also expressed distress at her father's anti-

Semitic writings.  *Id.* at  501–02.

It was abundantly and painfully clear to the Court that D.T.J. has been deeply wounded

by her father's verbal assaults on her mother and her mother's family, with whom she identifies.

Dr. Rand, consistent with this, described D.T.J. as having recounted the incidents of her father's

past violence "with a flat affect."  This, he stated, was "suggestive of a dissociative process

which serves as a psychological defense, a way of avoiding experiencing the full psychological

impact of that which she fears—namely harm or death to her mother, proximity to her father if

---

[4] In commenting on Jakubik's recent posts, Jakubik's sister, Bolivarne Jakubik Tunde, stated "if I ever . . . meet [D.T.J.], I will hit her on the mouth so hard she'll urinate and shit [in her panties]."  IX 34.

she were returned to Hungary, and the destruction of her happy and hopeful life in New York. Such dissociation is consistent with the presentation of victims of trauma." IX 17 at 14.

To be sure, as Petitioner has pointed out, the incidents of physical abuse of Schmirer to which D.T.J. was privy all occurred in or before the 2006 Hungarian court decree, and the verbal abuse that Jakubik has directed towards D.T.J. on Facebook all occurred after Schmirer brought her to the United States in violation of the Hungarian custody decree, provoking Jakubik's anger. Petitioner argues that, were D.T.J. returned to Hungary, it is not inevitable that such abuse would continue. Petitioner has also brought to the Court's attention a variety of statements by D.T.J. that, on their face, are arguably inconsistent with a fear of Jakubik. For example, in Facebook communications with Jakubik following her removal to the United States, D.T.J., attempting to dissuade Jakubik from pursuing her return to Hungary, stated that Jakubik was welcome to come to the United States and visit with her and her mother, and that the two would even cover the costs of his trip. *See* IX 6 at DTJ0182. However, the Court notes, these statements were all made after Jakubik disclosed to D.T.J. his legal efforts in Hungary to attempt to obtain D.T.J.'s return, and some occurred last month, after this lawsuit was initiated. The Court discounts the significance of these remarks, which appear to have been made, at least in part, for strategic reasons, to induce Jakubik to back off the legal action. It is also reasonable to infer that D.T.J. had less reason to fear abuse by Jakubik—whether in the form of violent retribution against her mother or verbal abuse of her—in the context of a time-limited visit by him to Haverstraw.

Considering all the evidence, the Court finds, by clear and convincing evidence, that repatriating D.T.J. to Hungary, and to proximity with her father, would severely damage D.T.J.'s psychological and emotional state. The Court's assessment is similar to that of the district court in *Blondin*. There, upon remand, the district court found, as a matter of fact, that a return to the

petitioner's country would trigger a recurrence of trauma in the children, who were in the process of recovering in this country from the "sustained, repeated traumatic state created in France by their father's physically and emotionally abusive treatment." *Application of Blondin v. Dubois* (*Blondin III*), 78 F. Supp. 2d 283, 291 (S.D.N.Y. 2000). So too, here. D.T.J. is, in the Court's estimation, in a psychologically healthy place, but remains fragile, and a compelled return to Hungary, and to proximity with her abusive and volatile father, would be deeply traumatic for D.T.J. Dr. Rand forcefully confirmed this finding. He credibly opined that "[p]utting [D.T.J.] back in Hungary in proximity of [her] relationship [with her father] . . . would lead to a . . . severe downturn in her psychological functioning" and would be "emotionally severely harmful to her." Tr. 587.

The Court has carefully considered whether there are "any ameliorative measures (by the parent and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with [the] child's repatriation" here, *Blondin II*, 189 F.3d at 248, thus protecting the child while also preserving the jurisdiction of the Hungarian court. Because the return to Hungary itself and proximity to Jakubik himself present a grave psychological risk to D.T.J., the Court does not find that such measures exist here. Even were a Hungarian court to direct that Jakubik have no unsupervised conduct with D.T.J., D.T.J. could, and in the Court's perception would, still reasonably fear lawless, violent, and abusive behavior by him.[5]

---

[5] There was considerable testimony and evidence presented, and Jakubik did not deny—on the contrary, he appeared to embrace the fact—that Jakubik frequently addressed D.T.J. by the Hungarian word for "little shit" ("szaros"), including in Facebook communications. *See* Tr. 22–23, , 409, 490–91; IX 6 at *passim*. The parties vigorously disputed, throughout trial, the extent, if any, to which that term is customarily used as a term of endearment in Hungary. The Court was not given sufficient evidence to resolve that dispute one way or another. The Court's decision is unaffected by this evidence. The Court does note that D.T.J. offered credible testimony that she

The Court separately considers D.T.J.'s allegations of sexual abuse. The Court is not persuaded that these allegations support a finding of a grave risk of harm to D.T.J. upon repatriation. D.T.J. testified, as did Jakubik, that, when she visited him, she often shared a bed with him. On one occasion, according to D.T.J., she awoke to find her father's hands on her breasts and underwear. That and D.T.J.'s claim that, when Jakubik has kissed D.T.J., he has done so on the lips, constitute the entirety of D.T.J.'s allegations of sexual abuse.

First, as all parties concede, the allegation of improper touching did not arise until after the petition was filed. The fact that D.T.J. did not make this claim, to anyone, until the day that the petition in this case was served on respondent raises questions about the veracity of this claim, and D.T.J. acknowledged that she reported this incident to her mother aware that it could prove useful in defeating the petition. *See* Tr. 446–47. Also significant, D.T.J. acknowledgd that Jakubik may have been asleep at the time she found his hands cupped around her breast and on her crotch, and acknowledged that Jakubik did not resist her when she moved away or ever persist in such conduct. Although not minimizing the seriousness of the allegation, neither this episode, nor Jakubik's admitted practice of greeting D.T.J. with a kiss on the lips, supports a finding, let alone by a clear and convincing standard, of a grave risk of serious harm to D.T.J.

For the foregoing reasons, the Court finds that Schmirer and D.T.J. have established three of the "narrow" affirmative defenses provided by the Hague Convention and ICARA: that D.T.J. is settled in the United States, that she is of sufficient age and maturity that the Court should take account of her objection to repatriation, and that repatriation would pose a grave risk of psychological harm to D.T.J. Each of these independently justifies denial of the petition. The Court has also considered whether, despite these affirmative defenses having been established,

---

frequently asked her father to stop referring to her that way, that he refused to do so, and that she experienced that term as an insult to her, whether or not it was intended as such. *See* Tr. 490.

the Court should exercise its discretion to repatriate D.T.J. nonetheless. *See Laguna*, 2008 WL 1986253, at *12 ("A court retains the discretion to return a child to his home country, regardless of any other determination, if return would further the aims of the Convention."). The Court sees no reason to do so. The equities, on balance, favor heeding D.T.J.'s desire to remain in the United States. Notably, there is no sign that Schmirer's removal of D.T.J., although unlawful, was motivated by a desire to "remov[e ] D.T.J. to [a] jurisdiction[] more favorable to [her] custody claims." *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005).

## CONCLUSION

For the reasons stated above, the petition is denied. The Clerk of Court is directed to close this case.[6]

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: July 26, 2013
New York, New York

---

[6] The Court wishes to thank counsel for the vigor and skill with which they litigated this case. Counsel's efforts were particularly impressive given the exceptionally compressed time period of this litigation—a schedule necessitated by the Convention's direction that courts resolve petitions pursuant to it within six weeks of their filing, if possible. *See* Hague Convention, art. 11. The Court recognizes that all counsel were working *pro bono*, and wishes to thank and acknowledge counsel for their substantial contribution of *pro bono* time and resources, which is in the finest tradition of this District. The Court specifically wishes to acknowledge the law firm of Cahill Gordon & Reindel LLP, which represented Petitioner; Robert E. Slatus, Esq., who represented Respondent; and Professor Jennifer Baum, Esq., and the law firm of O'Melveny & Myers LLP, which represented Intervenor, for their extensive *pro bono* contributions to this case.